## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**WILLIAM MAYFIELD**                                                    **PLAINTIFF**
**ADC #659228**

**V.**                          **NO. 4:23-cv-00046-JM-ERE**

**SHERIDAN DETENTION CENTER,** *et al.*                    **DEFENDANTS**

## RECOMMENDED DISPOSITION

### I.    Procedures for Filing Objections:

This Recommendation has been sent to United States District Judge James M. Moody Jr. You may file written objections to all or part of this Recommendation. Any objections filed must: (1) specifically explain the factual and/or legal basis for the objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not object, you risk waiving the right to appeal questions of fact and Judge Moody can adopt this Recommendation without independently reviewing the record.

### II.    Overview:

*Pro se* Plaintiff William Mayfield, an Arkansas Division of Correction inmate, brings this § 1983 action seeking money damages for alleged inadequate medical care received during his detention at the Sheridan Detention Facility ("Detention Center"), from December 3, 2022 to January 13, 2023. Mr. Mayfield currently proceeds on claims that Detention Center Administrator Danny Clark and former

Grant County Sheriff Ray Vance failed to provide him: (1) adequate medical treatment after he suffered numerous seizures; and (2) adequate seizure medication. *Doc. 23*.

Pending before the Court are Defendants' motions for summary judgment, supporting briefs, and statements of fact. *Docs. 237, 238, 239, 245, 246, 247*. Mr. Mayfield has responded (*Docs. 244, 254*), and Defendant Clark has replied to Mr. Mayfield's response (*Doc. 250*). The motions are now ripe for review.

For the reasons explained below, I recommend that the Court grant Defendants' motions for summary judgment.

## III.   Discussion:

### A.   Summary Judgment Standard

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must come forward with specific facts demonstrating a material dispute for trial. See FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

A party is entitled to summary judgment if -- but only if -- the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

Even when, as here, the parties dispute exactly what happened, summary judgment may still be appropriate. First, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (omitting citation). Second, while the court must accept Mr. Mayfield's version of the facts as true and draw all reasonable inferences from those facts, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" *Scott v. Harris*, 550 U.S. 372, 380 (2007)

**B.    Facts Without Material Controversy**[1]

On December 3, 2022, Grant County Sheriff's Office ("GCSO") Deputy Stephenson arrested Mr. Mayfield. *Doc. 237-4 at 4*. Upon Mr. Mayfield's arrest, Deputy Stephenson took him to Saline Memorial Hospital ("SMH") to be evaluated for seizure-like activity. *Doc. 237-7 at 1*.

At SMH, Mr. Mayfield tested positive for opiates, amphetamines, benzodiazepines, cannabinoids, and ecstasy MDMA. *Id. at 5*. A CT scan of Mr. Mayfield's brain showed no intracranial hemorrhage or acute intracranial abnormality. *Id. at 5-6*.  He was discharged from SMH the same day, with directions to follow up with his primary care physician as needed (*Id. at 8*), and Deputy Stephenson transported him to the Detention Center to be booked in and detained. *Doc. 237-4 at 1; Doc. 247-2 at 1*.

On December 31, 2022, Mr. Mayfield fell and began having seizures. *Doc. 23

---

[1] These facts are taken from: (1) Mr. Mayfield's deposition (*Doc. 237-2; Doc. 247-9*); (2) Defendant Clark's declaration (*Doc. 237-3*); (3) Mr. Mayfield's jail file, including medical records, grievances, and medical forms (*Docs. 237-4, 237-5, 237-6, 237-14, 237-15, 237-18, 247-2, 247-3, 247-4, 247-12, 247-13*); (4) Mr. Mayfield's Saline Memorial Hospital medical records (*Doc. 237-7; Doc. 247-11*); (5) Detention Center logs (*Doc. 237-8; Doc. 247-5*); (6) Detention Center video footage (*Docs. 243, 249*); (7) Mr. Mayfield's MEMS medical records (*Doc. 237-11; Doc. 247-10); Doc. 247-14*); (8) Mr. Mayfield's UAMS medical records (*Doc. 237-13; Doc. 247-14*); (9) the City of Sheridan's Mayor Cain Nattin's affidavit (*Doc. 237-21*); (10) Defendant Vance's affidavit (*Doc. 247-7*); and (11) Grant County Sheriff's Office administrative assistant Stefannie Pruitt's affidavit (*Doc. 247-15*).

When facts are disputed, if Mr. Mayfield has presented sworn facts that a reasonable factfinder could believe, I have assumed his version of events is correct.

4

*at 4.* Detention Center cameras did not capture the fall, but video footage shows that evening at 9:46 and 9:51, inmates used a telephone located in Mr. Mayfield's pod. At 9:52, inmates appeared to be yelling or calling out for assistance, and at 9:54, an inmate hit the call button. At 9:56, officers arrived, and more officers arrived at 9:59, 10:00, and 10:04. At 10:09, MEMS arrived, and at 10:14, MEMS personnel took Mr. Mayfield out of the pod on a stretcher.

MEMS transported Mr. Mayfield to the SMH emergency room. *Doc. 237-11 at 2; Doc. 247-10 at 3.* Medical staff took a CT scan of Mr. Mayfield's brain, which revealed no acute abnormality. *Doc. 247-11 at 14.* The emergency record reads in part as follows:

> William Mayfield is a 34 [year old male with previous medical history of traumatic brain injury][2] with seizures who presents to the [emergency department] for evaluation after possible seizure while in jail. The patient fell and hit the back of his head, and this was witnessed by other inmates. [Patient] was post[-]ictal and confused on arrival but protecting his airway. When patient was no longer post[-]ictal he reports headache and left elbow pain but denies any other injuries. [Patient] states he is supposed to take some sort of anti-epileptic, he thinks Keppra but is unsure of the dose, but the patient states he has not been given any of his home meds since being in jail.

*Id. at 9.*

Upon Mr. Mayfield's discharge from SMH, Dr. Kristen O'Connell prescribed 500 milligrams of Keppra, to be taken once daily for thirty days. *Id. at 3.* Mr.

---

[2] In September 2021, Mayfield suffered a head injury following an ATV accident and received treatment at University of Arkansas for Medical Sciences ("UAMS"). *Doc. 237-13 at 1.*

Mayfield received the following discharge instructions: "Please take Keppra daily.

Follow up with your primary care physician and neurologist to discuss which

medications you should be taking daily. Return if worse." *Id*.

At approximately 2:02 a.m. on January 1, 2023, deputies transported Mr.

Mayfield back to the Detention Center. *Doc. 237-8 at 14*.

On January 1 at 3:00 a.m., Mr. Mayfield submitted a medical form stating:

> I have had probably 10 seizures since I been here. I have been trying to
> see a doctor for a month. I recently had a brain surgery and I stay in
> pain in my head I really need pain meds. I was on [multiple]
> medications Gabapentin, Cyclobenzaprine, Hydrocodone, Ibuprofen. I
> am needing seizure medication. I also need to see a neurologist
> considering I hit my head w[h]ere I had my brain surgery[.] I think I
> may have knocked a plate loose on my skull[.] I feel it popping when I
> move my mouth or neck.

*Doc. 247-4 at 1*.

Medical personnel responded: "Meds being sent over by McCoy[-]Tygart."

*Id*.

The same day, Mr. Mayfield submitted a grievance stating:

> I was [taken] to the ER the day before on Dec 31, 2022 for having a life
> threatening seizure. I was prescribed seizure medicine because I am
> epileptic. Jail refuses to give me seizure medicine. They wouldn't even
> give me my medicine there is no excuse. There are chances I'm about
> to die due to this brain [surgery].

*Doc. 247-3 at 2*. Defendant Clark responded: "Took to Grant County Sheriff's

Office." *Id*.

Detention Center logs show the evening of January 1, around 10:00 p.m.,

Jailer Sullivan called MEMS "for Mayfield having a seizure." *Doc. 237-8 at 16;*
*Doc. 247-5 at 5.* At approximately 10:15 p.m., MEMS arrived and observed Mr.
Mayfield in his cell laying on the ground, shaking, spitting, and yelling. *Doc. 237-*
*11 at 5; Doc. 247-10 at 6.* MEMS personnel noted an inch-long, superficial cut on
the top of his head that had stopped bleeding. *Id.* Around 10:30 p.m., MEMS
personnel determined that Mr. Mayfield's vitals were normal. *Doc. 237-8 at 4-5;*
*Doc. 247-10 at 5-6.* MEMS personnel noted that Mr. Mayfield would not respond to
the medical crew, but that he had a normal neurological baseline, and his one-inch
cut was not bleeding and did not require stitches. *Doc. 237-8 at 5; Doc. 247-10 at 6.*
MEMS personnel also noted, "PD asked crew to take [Mr. Mayfield] back inside, so
crew removed IV and took him back inside . . . [Mr. Mayfield] was placed in his cell
to be monitored by PD." *Id.*

On January 2, Mr. Mayfield submitted both a medical form and grievance
complaining that jail staff refused to provide his seizure medication. *Doc. 247-3 at*
*3; Doc. 247-4 at 1-2.* The same day, GCSO personnel Brianna Vance responded to
Mr. Mayfield's medical request stating, "Prescription is being sent to jail from
McCoy Tygart [a local pharmacy]. Getting follow up appointment & neurologist
appointment – will send date ASAP – Brianna." *Doc. 247-4 at 2.*

The following events occurred on January 3. Mr. Mayfield submitted multiple
grievances complaining that: (1) jailers failed to assist him while he was having a

seizure; (2) MEMS did not arrive at the Detention Center until thirty minutes after he had the seizure; (3) jailers had failed to provide him prescribed seizure medication; (4) he had "plates" popping in his head; and (4) he needed to be evaluated by a neurologist and brain surgeon. *Doc. 247-3 at 4-14*.

At 1:14 p.m., the GCSO faxed Mr. Mayfield's Keppra prescription to a local drug store, McCoy-Tygart Drug, and instructed the pharmacy to deliver the medication directly to the Detention Center.[3] *Doc. 237-15 at 1*.  In addition, GCSO employee  Brianna Vance submitted a Health Services Request Form to the ADC, stating Mr. Mayfield: (1) had suffered seizure-like activity; (2) had suffered multiple seizures; (3) was transported to the ER on January 1, 2023, where medical staff told him he needed to be scheduled for a follow up appointment with a neurologist. *Doc. 247-4 at 3*. *Id*. In response, ADC personnel Shelly Byer noted, "ER visit approved. May be seen for [follow up]." *Id*.

At approximately 5:00 p.m., pharmacy staff filled Mr. Mayfield's Keppra prescription.

At approximately 5:15 p.m., inmates told Detention Center Jailer Barbara Strom that Mr. Mayfield was having a seizure. *Doc. 237-8 at 17; Doc. 247-5 at 6*. At that time, she called MEMS and contacted the GCSO. *Id*. At 5:24 p.m., MEMS

---

[3] New Year's Day was celebrated on Monday, January 2, 2023. Thus, January 3, 2023, likely was the first day local pharmacies were open after Mr. Mayfield's December 31st visit to the hospital.

arrived at the Detention Center. *Id*. Around 5:30 p.m., GCSO Sergeant Mann arrived at the Detention Center. *Id*. After providing medical care to Mr. Mayfield, at approximately 5:46 p.m., MEMS released Mr. Mayfield, and Sergeant Mann said that he would schedule a doctor's appointment for Mr. Mayfield. *Id*. While at the Detention Center to check on Mr. Mayfield, MEMS personnel documented that the "pharmacy [had delivered] the Keppra." *Doc. 247-10 at 12*.

Mr. Mayfield denies that he was given Keppra on January 3. *Doc. 247-9 at 84*. However, in a sworn declaration, Jailer Barbara Strom states that the Detention Center received "Mr. Mayfield's seizure medication" on January 3, 2023, and she watched Jailer Kolton Waggoner administer one pill to Mr. Mayfield and take him back to his pod. *Doc. 237-17 at 1*. Jailer Strom further testifies that she "noted the administration of seizure medication on Mr. Mayfield's booking sheet, which is another document that the jailers use to log important information that is specific to each inmate." *Id*.

Authenticated Detention Center medication logs show that on January 3, 2023 (labeled "Date In"), the Detention Center received medication for Mr. Mayfield: 30 Levetiracetam (the generic name for Keppra), with directions to take once daily at 6 p.m. *Doc. 237-18 at 3*; 247-1. In addition, a copy of Mr. Mayfield's booking sheet includes the following entry: 01/03/23 . . . RCVD SEIZURE MEDS AND KOLTON ADMINISTERED IT TO HIM 1 PILL. KOLTON AND JOY TOOK HIS BACK

TO HIS POD. BSTROM #219. *Doc. 327-4 at 2*.

According to Detention Center medication logs, Mr. Mayfield received one, 500 milligram dose of Keppra each day January 7 through 12 January 3. *Doc. 237-18 at 2-4*. However, the medication logs do not show that he received Keppra on January 3, 4, 5, or 6. *Id.*

On January 4, at approximately 8:03 a.m., GCSO staff spoke with Dr. Highsmith, a local physician, regarding Mr. Mayfield's medical condition. *Doc. 237-14 at 1; Doc. 247-12 at 4*. According to notes in Mr. Mayfield's jail file, Dr. Highsmith told staff he would check on Mr. Mayfield when he visited the following day. *Id*.

Also on January 4, Mr. Mayfield submitted three grievances and one medical form complaining about the "plates popping" in his head and requesting medical care and seizure medication. *Doc. 247-3 at 16-19; Doc. 247-4 at 4*.

On January 5, Mr. Mayfield submitted six grievances and one medical form requesting medical care and complaining about the Detention Center's failure to provide him adequate medical treatment. *Doc. 247-3 at 21-26; Doc. 247-4 at 6*.

The following additional events occurred on January 5. At 1:03 p.m., a Detention Center jailer called MEMS regarding Mr. Mayfield's previous head injury. *Doc. 247-10 at 18*. At 1:10 p.m., MEMS arrived at the Detention Center. *Id*. MEMS medical personnel noted that Mr. Mayfield refused an evaluation. *Doc. 237-*

*11 at 11; Doc. 247-10 at 18*.  At 1:42 p.m., Mr. Mayfield returned to his pod. *Doc. 237-8 at 24*.

Also that day, Dr. Highsmith visited the Detention Center. *Id. at 25*. He noted that Mr. Mayfield had recently been to SMH, and his CT scan was normal. *Doc. 237-22 at 1*. Dr. Highsmith called in a prescription for Gabapentin for Mr. Mayfield. *Id*.

On January 9, Defendant Clark spoke with Mr. Mayfield and attempted to resolve his multiple grievances. *Doc. 237-3 at 2; Doc. 247-5 at 18*. According to Defendant Clark, "there was no medical issue to resolved" because: (1) MEMS had provided Mr. Mayfield medical care four times between December 31, 2022, and January 9, 2023; (2) Mr. Mayfield had received medical care at SMH once; and (3) Dr. Highsmith had provided Mr. Mayfield medical care on one occasion. *Doc. 237-3 at 2*. In addition, by this time, Mr. Mayfield had begun receiving 500 mg Keppra daily, as prescribed. *Doc. 237-18 at 3-4*.

Also on January 9, GCSO personnel spoke with medical personnel at the University of Arkansas Medical Science ("UAMS") Medical Center regarding a neurological appointment for Mr. Mayfield. *Doc. 247-12 at 5*. UAMS personnel told GCSO staff that Mr. Mayfield would need a referral because he had not seen a neurologist since 2021. *Id*. GCSO staff noted "will make sure he sees [Dr.] Highsmith Thursday 1-12." *Id*.

On January 10, around 8:00 p.m. Mr. Mayfield requested medical attention, reporting that he felt pressure in his head and was seeing red. Detention Center staff called MEMS. *Doc. 237-8 at 30*. Around 8:05 p.m., MEMS arrived. *Id. at 31*. Mr. Mayfield's vital signs were normal and medical personnel did not observe any signs indicating pressure build up. *Doc. 237-8 at 32; Doc. 247-5 at 21*. They advised Mr. Mayfield that he would be examined by a physician on Thursday "and he agreed." *Doc. 247-10 at 24*. Around 8:30 p.m., Mr. Mayfield returned to his pod. *Doc. 247-5 at 19*.

On January 11, GCSO personnel again spoke with UAMS medical personnel. *Doc. 237-14 at 2; Doc. 247-12 at 6*. Again, UAMS personnel advised GCSO personnel that Mr. Mayfield would need a referral from his doctor to schedule an appointment with a neurologist. *Id*.

On January 12, Detention Center staff spoke to GSCO staff to discuss Mr. Mayfield's medical condition. *Id. at 2-3*. At that time, Mr. Mayfield complained that he had seizures in his sleep and his brain was swelling. *Id*.

Later that day, at 1:30 p.m., Detention Center staff requested that MEMS come to the Detention Center to evaluate Mr. Mayfield. *Doc. 237-8 at 38*. At approximately 1:35 p.m., MEMS arrived, and at 1:37 p.m., Dr. Highsmith arrived. *Doc. 237-8 at 38; Doc. 247-5 at 27*. At 1:48 p.m. GCSO staff requested that MEMS transport Mr. Mayfield to UAMS for treatment. *Id*.

Upon arrival at UAMS, medical staff noted:

William Mayfield is a 34 [years old] with a [previous medical history] of [traumatic brain injury], seizure? on [K]eppra who presents to the [emergency department] via EMS from prison for reported seizure. Per EMS report, patient had a seizure witnessed by fellow inmates and he reportedly had generalized convulsing with foaming at the mouth. Per report, patient did not have a true post-ictal period and had a rapid return to his baseline mental status following event. Patient reported [left] arm pain, denies any other pain/injuries at this time. Patient states that he is supposed to take [K]eppra 500mg 3x daily, although can't say who prescribes this medication to him. Seizure disorder is a result of [traumatic brain injury] he sustained in 2021 per patient. He reports that he has 3-4 seizures per month on average. He states that since being at the prison he is only being given 500mg [K]eppra once daily and this is why is having increased seizures. He denies fever, headache, cough, shortness of breath, chest pain, abdominal pain, n/v, diarrhea, dysuria.

*Doc. 247-14 at 15*.

At UAMS, Mr. Mayfield received another CT scan. *Id. at 42*. The results were normal. *Id. at 43*. UAMS medical staff prescribed Levetiracetam (Keppra) 500 milligram tablet to be taken twice daily. *Id. at 23*.

After receiving treatment at UAMS, Mr. Mayfield was transferred to the Arkansas Division of Correction's Ouachita River Unit, and he did not return to the Detention Center. *Doc. 237-4 at 2*.

### C.    Medical Deliberate Indifference Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."[4] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (omitting quotations and citation). At the summary judgment stage, Mr. Mayfield "must clear a substantial evidentiary threshold" showing that the defendant knew of but deliberately disregarded his serious medical needs. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019).

An inadvertent or negligent failure to provide adequate medical care does not amount to deliberate indifference. *Id. at 575*. Instead, deliberate indifference requires culpability akin to criminal recklessness, which is more blameworthy than negligence but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

---

[4] Although Defendant Clark states that Mr. Mayfield was a pre-trial detainee during the relevant period (*Doc. 238 at 5*), he was being held for parole violation on a prior conviction. *Doc. 5 at 3*. Accordingly, Mr. Mayfield's claims are analyzed under the Eighth Amendment, which applies to convicted prisoners. This distinction, however, does not alter the analysis of Mr. Mayfield's claims. See *Vaughn v. Greene Cty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006) (noting the Eighth Circuit has repeatedly applied the Eighth Amendment's deliberate-indifference standard to claims by pretrial detainees).

**1.    Defendant Clark**

**a.    Qualified Immunity – Individual Capacity Claim**

Defendant Clark asserts qualified immunity, which protects government officials from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).

**b.    Adequate Medical Treatment For Seizures**

Mr. Mayfield claims that Defendant Clark failed to provide him adequate medical care in several respects. First, regarding his seizure on December 31, 2022, he says "[i]t took at least 45 minutes for Danny Clark and medical help to even come in the pod to help[,]" and he was laying there for "close to an hour" before MEMS transported him to the hospital. *Doc. 23 at 4*. Security video evidence, however, shows that an inmate hit the call button at 9:54 p.m., officers arrived two minutes later, and MEMS took Mr. Mayfield out of his pod on a stretcher by 10:14. *Doc. 237-8 at 12; Doc. 247-5 at 3.*

In addition to video footage, Detention Center shift logs document that on December 31 at 10:05 p.m., a jailer reported that Mr. Mayfield had fallen, MEMS arrived at 10:13, and at 10:25 MEMS left with Mayfield. *Doc. 237-8 at 12; Doc. 247-5 at 3.* Another log records that at 10:00, officers went to Mr. Mayfield's pod because he had passed out, and at 10:30, MEMS took him to the hospital.[5] *Doc. 237-8 at 14; Doc. 247-5 at 3.*

Contrary to Mr. Mayfield's allegations, the record demonstrates that on December 31, 2022, Detention Center staff responded to his medical needs within approximately ten minutes and immediately contacted emergency personnel. In addition, Mr. Mayfield provides no evidence that Defendant Clark was personally aware of his condition or need for medical treatment that day. Importantly, a supervisory officer can be held liable under § 1983 only when he is personally involved in the constitutional violation or when his corrective inaction constitutes deliberate indifference toward a constitutional violation. *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 764 (8th Cir. 2021).

Second, Mr. Mayfield complains he had a seizure on January 1, 2023, it took "at least 45 minutes" for anyone to help him, and "an hour or so later" the ambulance showed up. *Doc. 23 at 5*. Again, Mr. Mayfield fails to connect Defendant Clark to

---

[5] The slight time differences reported by jailers in the logs are immaterial.

this event. In addition, undisputed evidence shows that at 10:06 p.m., a jailer called MEMS because Mr. Mayfield was having a seizure (*Doc. 237-8 at 16; Doc. 247-5 at 5*), and at approximately 10:15 p.m., MEMS arrived and provided him medical care in the ambulance. *Doc. 237-8 at 4-5; Doc. 247-10 at 5-6.*

Third, Mr. Mayfield complains that after MEMS arrived on January 1, he was released back to the Detention Center against medical advice. *Doc. 244 at 3*. But Mr. Mayfield fails to explain Defendant Clark's involvement. In a sworn declaration, Defendant Clark states that GCSO deputy Canaan Swiger signed a MEMS patient refusal form on Mr. Mayfield's behalf. *Doc. 250-1 at 1*. Defendant Clark states: "I was not personally involved or responsible for the deputy's decision for MEMS not to transport Mr. Mayfield on January 1, 2023. I did not even have knowledge of the decision." *Id.*

The undisputed evidence shows that Detention Center staff reasonably and promptly responded to Mr. Mayfield's medical needs and provided him constitutionally adequate medical treatment from December 31, 2022 through January 12, 2023.[6] And Mr. Mayfield provides no evidence that Defendant Clark:

---

[6] In addition to medical care Mr. Mayfield received on December 31, 2022 and January 1, 2023, on January 3, 5, 10, and 12, Detention Center staff contacted MEMS to have Mr. Mayfield examined. Jail logs show that on each occasion, MEMS promptly arrived. On January 4, GCSO personnel spoke with Dr. Highsmith regarding Mr. Mayfield's medical condition, and Dr. Highsmith planned to see Mr. Mayfield when he visited the facility the following day. *Doc. 237-14 at 1; Doc. 247-12 at 4*. On January 11, 2023, GCSO staff spoke with UAMS Medical Center to have Mr. Mayfield seen by a neurologist, and the next day, the GCSO told Detention Center staff that Mr. Mayfield would need a referral to see a neurologist. *Doc. 237-14 at 2-3; Doc. 247-*

(1) was personally involved in providing his medical treatment; (2) intentionally denied him any medical treatment; or (3) caused him to suffer any delay in receiving medical treatment. Mr. Mayfield's unsubstantiated self-serving allegations are insufficient to defeat a motion for summary judgment. *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473-74 (8th Cir. 2010) (noting that self-serving affidavits will not defeat a properly supported motion for summary judgment, rather, "the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

On this record, no reasonable jury could conclude that Defendant Clark demonstrated deliberate indifference to Mr. Mayfield's serious medical needs. As a result, Defendant Clark is entitled to qualified immunity.

**c.    Adequate Seizure Medication**

In addition to claiming that he received inadequate medical treatment, Mr. Mayfield claims that Defendant Clark was deliberately indifferent to his serious medical needs by: (1) failing to give him the correct dosage of seizure medication; and (2) refusing to provide him any seizure medication for several days. Mr. Mayfield fails to present sufficient evidence to withstand summary judgment on these claims.

---

*12 at 6-7.*

First, although Mr. Mayfield maintains that Detention Center staff, including Defendant Clark, should have provided him 500 milligrams of Keppra twice daily, the undisputed evidence shows that, on December 31, 2022, when Mr. Mayfield was discharged from SMH, Dr. Frazier prescribed 500 milligrams of Keppra to be taken *once* a day. *Doc. 247-11 at 3*.[7] Mr. Mayfield's first argument is directly contradicted by the undisputed record.

Second, Mr. Mayfield fails to present credible evidence that Defendant Clark knew that Mr. Mayfield failed to receive his seizure medication and failed to take reasonable action in response.

By declaration, Defendant Clark states that because Mr. Mayfield was a GCSO inmate, the GCSO was responsible for submitting his prescriptions to a pharmacy to be filled. *Doc. 237-3 at 1*; see also *Doc. 247-15 at 2*. It is undisputed that Defendant Clark had no control over GCSO personnel. *Doc. 237-3 at 1*. Defendant Clark further states that as Detention Center Administrator, he expected that jailers would provide Mr. Mayfield medication as prescribed. *Doc. 237-3 at 2*.

---

[7] In his response to Defendant Vance's motion for summary judgment, Mr. Mayfield includes his medical records from his emergency room visit on October 28, 2021. *Doc. 254-1 at 8-9*. Those records reflect that, at that time, his treating physician prescribed him 500 milligrams of Keppra to be taken twice daily. *Id*. I do not question the validity of Mr. Mayfield's medical records. However, it is undisputed that, on January 1, 2023, Dr. Frazier only prescribed him 500 milligrams of Keppra to be taken once a day. In addition, Mr. Mayfield contradicts his own testimony and states that he did not take seizure medication one "day in [his] life" until he fell in the Detention Center. *Id. at 20*.

In grievances submitted January 1, 2, and 3, Mr. Mayfield complained that he had not received the Keppra prescribed by Dr. Frazier on December 31. *Doc. 247-3 at 2, 3, 5-6, 14*. Mr. Mayfield submitted those grievances *before* the GSCO presented his prescription to McCoy-Tygart Drug for filling on January 3, and Defendant Clark responded to each grievance as follows: "Took to Grant County Sheriff's Office." *Id*. Defendant Clark states under oath that he had no knowledge that Detention Center jailers denied Mr. Clark seizure medication (*Doc. 237-3 at 2*), and Mr. Mayfield provides no credible evidence showing otherwise.[8]

Finally, even assuming jailers failed to provide Mr. Mayfield seizure medication on January 3, 4, 5, and 6, he provides no evidence establishing a detrimental effect from the four-day delay.[9] See *Corwin v. City of Independence,*

---

[8] In deposition, Mr. Mayfield initially stated that he could not remember when Defendant Clark refused to provide him seizure medication. *Doc. 237-2 at 4; Doc. 247-9 at 12*. Later, he stated that "of course" he personally asked Defendant Clark for medication every day from December 31, 2022 until January 7, 2023 (*Doc. 237-2 at 5; Doc. 247-9 at 18-19*), but he finally conceded that he did not know what caused the delay in receiving his medication. *Doc. 237-2 at 21; Doc. 247-9 at 84*. Mr. Mayfield's vague and inconsistent deposition testimony fails to counter evidence that Defendant Clark had no knowledge that Mr. Mayfield was not receiving his seizure medicine after January 3.

In response to Defendant Clark's motion for summary judgment, Mr. Mayfield provides an unsworn statement that he "personally begged [Defendant Clark] to give [him] these seizure meds," but Defendant Clark "personally refused to give them to me[, and] would not order his employees to give them to me." *Doc. 244 at 2*. Similarly, in response to Defendant Vance's motion, Mr. Mayfield states that both Defendants "knew every day I needed this medication [but] they both deliberately and purposely ignored my medical condition." *Doc. 254-1 at 28*. To establish a genuine issue of material fact on summary judgment, Mr. Mayfield must do more than point to unsupported self-serving allegations. *Banks v. Deere*, 829 F.3d 661, 667 (8th Cir. 2016) (unsworn and unattested statements were inadmissible and not properly considered in deciding motion for summary judgment).

[9] Mr. Mayfield alleges, but points to no verifying medical evidence showing, that if

829 F.3d 695 (8th Cir. 2016) (summary judgment appropriate where pretrial detainee failed to produce verifying medical evidence showing a detrimental effect due to delay in medical treatment); *Hines v. Anderson*, 547 F.3d 915, 920–21 (8th Cir. 2008) (holding that unspecified delays in refilling the prisoner's various prescriptions did not rise to the level of constitutional violation); *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) ("To avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect); *Ervin v. Busby*, 992 F.2d 147, 151 (8th (Cir. 1993) (holding that one-month delay in refilling prescription may have been negligent but did not amount to deliberate indifference).

At most, the four-day delay in Mr. Mayfield receiving his seizure medication amounted to negligence. However, Mr. Mayfield "must show more than negligence, more even than gross negligence" to create a genuine issue of material fact to support his claim against Defendant Clark. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

On this summary judgment record, Mr. Mayfield has failed to present evidence to allow a reasonable fact finder to conclude that he suffered a

---

Defendant Clark had provided him adequate seizure medication beginning January 1, 2023, he would not have suffered additional seizures or needed any additional medical treatment. *Doc. 247-9 at 30; Doc. 244 at 2.* In his July 12, 2024 deposition, Mr. Mayfield stated that he still took Keppra, but continued to experience two seizures a month. *Doc. 237-2 at 8; doc. 247-9 at 32.*

constitutional deprivation because of Defendant Clark's conduct. As a result, Defendant Clark is entitled to qualified immunity.

### d.    Official Capacity Claim

Mr. Mayfield sues Defendant Clark in both his individual and official capacities. *Doc. 23 at 2*. A suit against a city or county employee in his or her official capacity is treated as a claim against the local government employer. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). However, municipalities and other local government units may not be held vicariously liable under § 1983. To establish municipal liability at the summary judgment stage, the plaintiff must come forward with evidence that the claimed constitutional violation resulted directly from an official municipal policy or custom. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018). Mr. Mayfield has failed to make this showing.

In addition, the Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (quoting *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)). Accordingly, without a constitutional violation by Defendant Clark, there can be no liability on the part of the City of Sheridan, and Mr. Mayfield's official-capacity claim should be dismissed with prejudice.

### e.    Tort Liability

"Municipalities are immune from tort liability except to the extent that they are covered by liability insurance." *Boling v. Harcros Chemicals, Inc.*, 2020 WL 4018643 at *1 (E.D. Ark. July 15, 2020) (citing ARK. CODE ANN. § 21-9-301).

Defendant Clark provides the affidavit of Cain Nattin, the Mayor of the City of Sheridan. Mayor Nattin testifies that he conducted a review of City records to determine whether the City maintained liability insurance covering Mr. Mayfield's alleged injuries, and he determined that the answer is: No. *Doc. 237-21. Id. at 1. Id.* As a result, the City of Sheridan is immune from any tort liability.

### 2.    Defendant Vance

### a.    Qualified Immunity – Individual Capacity Claim[10]

Defendant Vance asserts that he is entitled to qualified immunity because Mr. Mayfield is unable to establish that he caused him to suffer the violation of a constitutional right. *Doc. 246 at 27.*

The undisputed evidence shows that Defendant Vance retired as the Sheriff of

---

[10] Mr. Mayfield sued Defendant Vance in his individual and official capacities. At the pleading stage in this case, Defendant Vance moved to dismiss all claims against him on the ground that he retired from the Grant County Sheriff's Office on December 31, 2022 and was not a county official or employee during Mr. Mayfield's incarceration at the Detention Center. *Docs. 51, 52.* Given the posture of the case and Mr. Mayfield's allegation that Defendant Vance was present during the relevant period, Judge Moody declined to dismiss claims against Defendant Vance in his individual capacity. *Docs. 54, 57.* However, because Mr. Mayfield failed to allege that he suffered a constitutional injury caused by a Grant County custom or policy, Judge Moody dismissed claims against Defendant Vance in his official capacity.

Grant County on December 31, 2022. *Doc. 247-7 at 1*. In his deposition, Mr. Mayfield testified that he personally asked Defendant Vance for his medication on two different dates, but he could not recall those dates. *Doc. 237-2 at 18-19; Doc. 247-9 at 71, 76*. He also testified that Defendant Vance: (1) was present when IV tubes were pulled out of his arm (*Doc. 237-2 at 18*); and (2) "one time" felt the side of his head and said he could tell the plates had moved, *Doc. 237-2 at 18; Doc. 247-9 at 71*.

The undisputed evidence shows that, on December 31, 2022, the last day Defendant Vance served as Sheriff of Grant County, a Detention Center jailer contacted MEMS, and MEMS promptly transported Mr. Mayfield to the SMH for treatment. *Doc. 237-8 at 12; Doc. 247-5 at 3*. Mr. Mayfield has failed to offer any evidence that, after December 31, 2022, Defendant Vance: (1) was personally responsible for providing him medical care or medication; (2) was personally aware of his need for medical care or medication; or (3) intentionally denied him medical care or medication. Without any such evidence, Mr. Mayfield has failed to create any genuine issue of material fact regarding his claim that Defendant Vance was deliberately indifferent to his medical needs.

As a result, Defendant Vance is entitled to qualified immunity on Mr. Mayfield's medical deliberate indifference claim.

**IV.   Conclusion:**

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' motions for summary judgment (*Docs. 237, 245*) be GRANTED.

2.    Mr. Mayfield's claims against Defendants Clark and Vance be DISMISSED, with prejudice.

3.    The Clerk be instructed to close this case.

DATED this 6 November 2024.


_____
UNITED STATES MAGISTRATE JUDGE